IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

          Plaintiff,

    vs.                  **Case No. 12-40013-01-RDR**

JESUS SOTELO-LOPEZ,

          Defendant.

_____

**<u>MEMORANDUM AND ORDER</u>**

This matter is presently before the court upon defendant's motion to suppress evidence. The court has conducted a hearing on the motion and is now prepared to rule.

The defendant is charged in a one-count indictment with possession with intent to distribute more than 500 grams of a mixture or substance containing methamphetamine in violation of 21 U.S.C. § 841(a)(1). The charge arises from a traffic stop in Russell County, Kansas on January 5, 2012.

The defendant seeks to suppress the evidence that was obtained during the traffic stop. He contends that (1) his vehicle was stopped without reasonable suspicion or probable cause to believe that he had committed a violation of law; (2) he was detained for an unreasonably long time; (3) his alleged consent to search was the fruit of the illegal detention and the detention was beyond the reasonable scope of the stop; (4) his alleged consent was not voluntary; (5) the search exceeded the scope of his consent; and

(6) he was illegally detained when he was compelled to drive his car to a garage for disassembly.

The government has responded that the defendant's arguments are without merit.  The government has further argued that the defendant lacks standing to raise most of these issues.

*FINDINGS OF FACT*

On January 5, 2012 at approximately 12:25 p.m., Scott Walker, a Kansas Highway Patrol trooper, was on patrol on Interstate 70 in Russell County, Kansas.  I-70 is a four-lane, divided highway with a thirty to forty foot grass median in between the lanes.  Trooper Walker was traveling westbound in a marked KHP unit.  He began to slow down so he could turn around in the median and proceed on the eastbound lanes.  As he began to slow down, he noticed a white 2001 Jeep Grand Cherokee traveling eastbound.  The Grand Cherokee was traveling at about the speed limit, which is 75 miles per hour. Despite the tinted windshield, Trooper Walker saw that the driver was not wearing his seatbelt.  The color of the driver's shirt, yellow, allowed Trooper Walker to observe the absence of the seat belt.  Kansas law generally requires that front seat passengers wear their seatbelts.  Trooper Walker turned in the median and began to follow the Jeep Grand Cherokee.

Trooper Walker is an experienced law enforcement officer.  He has been employed as a trooper for nine years.  During that period, he has received extensive training in drug interdiction.

Trooper Walker noticed that the Grand Cherokee immediately exited I-70 at the Dorrance exit, Exit 199.  The vehicle traveled approximately one and one-half miles and stopped at the gas pumps of a farmer's co-op in Dorrance.  Trooper Walker pulled into an adjacent lot and watched the vehicle and its occupants.  He noted there were two individuals in the vehicle.  They did not get gas, but both went inside the convenience store and returned to the Grand Cherokee with bottles of water.  Trooper Walker had noticed that the license tag on the Grand Cherokee was from Oklahoma.  He thought it was unusual for an out-of-state vehicle to exit at the Dorrance exit.

The Grand Cherokee then left the co-op and turned east on "old Highway 40."  This highway is a two-lane county road that takes you to Salina.  It is not a road that one would ordinarily travel to return to Oklahoma.

Trooper Walker followed in his patrol unit and then activated his emergency lights to pull the vehicle over.  The Grand Cherokee pulled quickly to the side of the road.  Trooper Walker's patrol vehicle is equipped with a video camera on the front windshield and one on the rear windshield.  The camera begins recording when the emergency lights are activated.  The recording actually captures the events about two minutes before the emergency lights are activated.  Thus, in this case, the video begins with Trooper Walker following the Grand Cherokee past the farmer's co-op and

then parking in an adjacent lot.  Trooper Walker wears a microphone which he can operate.  The microphone recorded most of the conversations that occurred, but some are difficult to discern due to the volume of the particular speaker.

The Grand Cherokee parked at a slight angle when it stopped on the side of the road.  This slight angle prevented the camera in Trooper Walker's car from viewing what occurred on the passenger side of the Grand Cherokee.

Trooper Walker approaches the Grand Cherokee from the passenger side.  The window is rolled down.  Trooper Walker notices a male driver and female passenger.  Trooper Walker says, "Hey, how are you guys doing today?  Do you have your driver's license on you?"  The driver, who is later identified as Jesus Sotelo-Lopez, states initially that he does not speak English.  Trooper Walker begins to converse with the occupants of the car.  During the course of the conversation, he appears able to make the occupants understand his questions.  The answers provided by the occupants appear relevant to the questions.  The passenger, who is later identified as Lorena Osuna-Zazueta, appears to better understand English than Sotelo-Lopez.  Trooper Walker then asks, "Where are you guys going?"  Sotelo-Lopez responds, "Okla."  Trooper Walker says, "Oklahoma," and Sotelo-Lopez indicates that is correct. Trooper Walker then questions them about why they are on this road because he notes "this road takes you out to Kansas in the middle

of nowhere." He later states: "No seat belt on. No license. Do you have an ID on you?" The driver had been unable to produce a driver's license. Both occupants produced Mexican identification cards. Sotelo-Lopez indicates he is from Sonora, Mexico. Trooper Walker asks if they are husband and wife. The response is affirmative. Trooper Walker then asks, "Whose car is this?" Sotelo-Lopez says, "An amigo." Trooper Walker tells Sotelo-Lopez to come back to his patrol unit. Sotelo-Walker exits the Grand Cherokee and gets into Trooper Walker's patrol unit.

As he stood by the passenger window, Trooper Walker notices that the occupants are only carrying one duffel bag. He also notices that the car appears extremely clean but there are wrappers and empty bottles on the floorboards. This suggests to Trooper Walker that the occupants had been traveling long distances without many stops. He also notices air freshener in the vehicle. Finally, he notices a prepaid cell phone. He further observes that the gas tank is full. All of these matters indicate suspicious activity to Trooper Walker. Most of these matters are common to drug traffickers. When he later learns that the occupants had been on a ten-day trip, he finds it very unusual for a husband and wife to be traveling on such a lengthy trip with only one bag. He also finds it most unusual that they stopped at a gas station when their tank indicates that it is full. Since the tank reads full, it would be unusual to stop just for water if they had recently

stopped to fill the tank.  He believed that this fact suggested that they had exited and stopped only after they noticed him about to turn around in the median.

Trooper Walker seeks information from his dispatcher on the occupants and the vehicle.  He indicates to her that the reason the vehicle was stopped was a seat belt violation.  In seeking this information, Trooper Walker tells the dispatcher, "I don't think you'll find anything on them."  He makes this comment because of the lack of driver's licenses for the occupants.  Trooper Walker notes that the Grand Cherokee had been registered to Miguel Lopez-Lopez on December 21, 2011.  Insurance for the vehicle had also been purchased on that date and was good for only one month.  The title for the car showed "rebuilt/salvage."  He further notes that Osuna-Zazueta's Mexican identification card shows an address in Phoenix, Arizona.

As he waits for information from his dispatcher, Trooper Walker begins using his telephone to obtain Spanish translations from the internet.  He asks Sotelo-Lopez where he is coming from. Sotelo-Lopez responds "Las Vegas."  Trooper Walker asks him why he was in Las Vegas.  Sotelo-Lopez says, "Familia."  At this time, another KHP trooper, Scott Goheen, arrives on the scene and parks behind Trooper Walker's unit.  Trooper Walker and Trooper Goheen briefly discuss the circumstances of the stop.  Trooper Walker tells Trooper Goheen to go to the Grand Cherokee and discuss the

nature of the trip with the passenger.  Trooper Walker then begins again talking with Sotelo-Lopez using the phone as a translator. He learns that Sotelo-Lopez had been in Las Vegas for about eight days beginning on December 25, 2011.  Sotelo-Lopez again indicates that the vehicle does not belong to him, but belongs to an "amigo." Sotelo-Lopez says that the owner's name is Miguel Lopez-Lopez. Trooper Walker than asks him why he had left the interstate. Before he gets an answer, the dispatcher provides some additional information and requests some additional information.  Sotelo-Lopez returns to the Grand Cherokee.  Trooper Walker remains in his patrol unit.  Trooper Walker noticed that Sotelo-Lopez had been extremely nervous during the entire encounter.  He noted that his nervousness never lessened.  At this point, the Grand Cherokee has been stopped for about ten minutes.  Trooper Walker turns off the microphone.

About ten minutes later, Trooper Walker turns the microphone back on.  He exits his patrol unit and again approaches the passenger side of the Grand Cherokee.  He returns their documents to them and gives them a warning for failure to wear a seat belt. He says, "Here is your information back.  Be sure to wear your seatbelts so you are safe and don't get hurt.  Adios."  He then takes a few steps toward the rear of the vehicle and returns quickly to the passenger window.  He then says, "Sir, can I ask you some more questions?"  Sotelo-Lopez responds in the affirmative.

Trooper Walker asks if they have any drugs, weapons or large amounts of money in the car. Osuna-Zazueta says no. Trooper Walker then asks if he can search the car. Both occupants eventually say yes. The occupants exit the Grand Cherokee and stand in front of their vehicle. The stop has now lasted slightly over twenty minutes.

Trooper Walker and Trooper Goheen begin searching the car. The microphone has been turned off. The search continues for some period of time. Trooper Walker gets underneath the Grand Cherokee and examines the underbody. He notices that the oil pan is clean which is at odds with the rest of the underbody. He further notices that the fasteners on the oil pan look like they had been tooled. The tooling suggests to Trooper Walker that the oil pan had recently been removed. He also observes a weld on the oil pan from the interior which he believes should not be there. He sees several random welds which suggests the probability of a hidden compartment to him. He notices that the gasket for the oil pan is new and does not fit exactly. He taps on the oil pan and hears a thud. He believes that he should hear a hollow sound.

After the car has been stopped for over an hour, Trooper Walker asks Sotelo-Lopez to follow him. Sotelo-Lopez agrees to do so. The vehicles return to the co-op. The video of the stop ends at this point. At the co-op, Trooper Walker uses a fiber optic probe to examine the oil pan. He is unable to see anything

8

initially due to the presence of the oil.  The oil pan of the Grand Cherokee is then drained.  The use of the fiber optic probe through the dipstick then reveals green plastic bags in the oil pan.  The occupants of the vehicle were than placed under arrest. Subsequently, the oil pan was removed and 3.1 pounds of methamphetamine were found in a hidden compartment in the oil pan.

*CONCLUSIONS OF LAW*

**Initial Stop**

Under the Fourth Amendment, a traffic stop is a "seizure," which is reasonable only if (1) the officer's action was "justified at its inception," and (2) the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 19-20 (1968).  Before stopping an automobile, an officer must have a "reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. White, 584 F.3d 935, 945 (10th Cir. 2009) (quoting United States v. Winder, 557 F.3d 1129, 1134 (10th Cir.), cert. denied, 129 S.Ct. 2881 (2009)).  Reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.  United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004).  Furthermore, "reasonable suspicion may rely on information less reliable than that required to show probable cause . . . and it need not be correct." Id. (internal citations

omitted).

Here, Trooper Walker observed the defendant driving without a seat belt.  The defendant has suggested that Trooper Walker's claim that he saw him not wearing a seat belt is "incredible."  He has suggested that Trooper Walker could not have seen the violation because (1) of the speed that the Grand Cherokee was traveling; (2) of the tinted windows on the Grand Cherokee; (3) of the distance between the Grand Cherokee and the patrol vehicle; and (4) the sun would have been in Trooper Walker's eyes as he traveled westbound. Trooper Walker testified he was "100 percent sure" that the defendant was not wearing a seat belt when he saw the defendant traveling eastbound as he was slowing his patrol vehicle to turn around in the median.  The defendant's counsel probed the various problems noted above in cross-examining Trooper Walker, but the court ultimately found Trooper Walker's testimony credible.  The failure to wear a seat belt while driving is a violation of Kansas law.  K.S.A. 8-2503.  Having developed a reasonable suspicion that K.S.A. 8-2503 had been violated, Trooper Walker was justified in stopping the defendant's vehicle.

**Subsequent Detention**

Even if the initial stop of defendant's car was justified, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place."  <u>United States v. Williams</u>, 271 F.3d 1262, 1266 (10th Cir. 2001), <u>cert.</u>

denied, 535 U.S. 1019 (2002). "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." United States v. Cervine, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted).  During a routine traffic stop, the detaining officer is permitted to ask such questions, examine such documentation, and run such computer verifications as necessary to determine that the driver has a valid license and is entitled to operate the vehicle.  United States v. Miller, 84 F.3d 1244, 1250 (10th Cir.), cert. denied, 519 U.S. 985 (1996).  The officer may detain the driver and his vehicle as long as reasonably necessary to make these determinations and to issue a citation or warning.  United States v. Martinez, 983 F.2d 968, 974 (10th Cir. 1992), cert. denied, 508 U.S. 922 (1993); see also United States v. Lyons, 510 F.3d 1225, 1236 (10th Cir. 2007) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."). However, if the officer wants to detain the driver for further questioning, he may do so if "(1) 'during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity;' or (2) 'the driver voluntarily consents to the officer's additional questioning.'"  United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997) (quoting United States v. Sandoval, 29 F.3d 537, 540

11

(10th Cir. 1994)).  If the officer continues to question the driver in the absence of either of these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms."  Id. (internal quotations and citation omitted).

The defendant argues that the length of detention was excessive for a seat belt violation.  He contends that twenty minutes was too long to make inquiries, noting that Trooper Walker had told his dispatcher, "I don't think you're going to find anything on them."  The defendant also argues that he was detained after his documents were returned to him.  He suggests that the brief break, less than five seconds, after the return of the papers did not signify that he was free to leave.

The court is not persuaded that the length of the stop was excessive.  After receiving the various documents supplied by the occupants of the Grand Cherokee, Trooper Walker began the process of attempting to check the information that had been provided.  He was leery of finding any significant information because of the failure of the driver or the passenger to possess a driver's license.  He, however, could certainly seek to check all the information that had been provided and ask about travel plans and vehicle ownership.  After he received the information from his dispatcher, he decided to provide the defendant with a warning.  He then returned to the Grand Cherokee and provided the defendant and

12

the passenger with the documents and the warning.  The court fails to find that this portion of the stop was excessive.

The court must next consider whether the stop became a consensual encounter after Trooper Walker returned the documents and issued the warning.  "'Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.'"  United States v. Bradford, 423 F.3d 1149, 1158 (10th Cir. 2005) (quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)).  Under this standard, "an officer is not required to inform a suspect that she does not have to respond to questioning or that she is free to leave."  Id.  A court looks at whether the officer made any "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled suggesting that the detention had not ended."  Id. at 1159 (internal quotation marks and citation omitted).

The court is persuaded that Trooper Walker adequately conveyed to the occupants of the Grand Cherokee that the stop had ended.  He told them:  "Here is your information back.  Be sure to wear your seatbelts so you are safe and don't get hurt.  Adios."  He then stepped away from the vehicle before he returned a few seconds

later.   Farewell language such as "Adios" suggests that any subsequent discussion was consensual.   See United States v. Ledesma, 447 F.3d 1307, 1315 (10th Cir. 2006).   Testimony at the hearing, coupled with the court's review of the video, reveals no indicia of coercion, and convinces the court that Trooper Walker's statements and acts established a consensual encounter at the moment he said "Adios."

**Standing**

The defendant has also challenged the search of the Grand Cherokee.   He contends that (1) the consent to search was the fruit of the illegal detention; (2) the consent was not made voluntarily; and (3) the search exceeded the scope of the consent.   Finally, he asserts that he was illegally detained when the troopers compelled him to drive his vehicle to the garage to permit disassembly of the vehicle.

The government has argued that the consent to search, the search of the Grand Cherokee at the roadside, and relocation of the vehicle were all products of the defendant's knowing, voluntary and unqualified consents.   The government further contends that (1) any detention of the defendant was based upon reasonable suspicion that the Grand Cherokee was being used to transport illegal narcotics; and (2) the troopers had probable cause to search the Grand Cherokee based upon the evidence of a hidden compartment coupled with other observations.   Finally, the government contends that the

defendant, as a non-owner of the vehicle, lacks standing to contest the search of the Grand Cherokee.

Because Fourth Amendment rights are personal, defendant bears the burden of showing he had a reasonable expectation of privacy in the area searched before he may challenge the search itself. United States v. Johnson, 584 F.3d 995, 998 (10th Cir. 2009).   To determine whether defendant's privacy rights are protected by the Fourth Amendment, the court considers "[1] whether the individual manifested a subjective expectation of privacy in the area searched and [2] whether society is prepared to recognize that expectation as objectively reasonable." United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000) (internal quotation omitted).   To demonstrate a reasonable expectation, defendant must show he had a "'legitimate possessory interest in or [a] lawful control over the car.'" United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003) (quoting Allen, 235 F.3d at 489)) (alteration in original).   The court considers the following factors relevant to this determination:  (1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle.   Id. (quoting Allen, 235 F.3d at 489).   "Where the proponent of a motion to suppress is the car's driver but not the

15

registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest." Id. (citing Allen, 235 F.3d at 489; Martinez, 983 F.2d at 973). At a minimum, defendant must establish that "he gained possession from the owner or someone with authority to grant possession." Id. (quoting United States v. Arango, 912 F.2d 441, 445 (10th Cir. 1990)).

At the scene of the stop, the defendant told Trooper Walker on several occasions that the vehicle belonged to an "amigo." He identified him as Miguel Lopez-Lopez. He offered no explanation why he possessed the Grand Cherokee. At the hearing on the motion to suppress, the defendant testified that he purchased the vehicle at 44th and Main in Oklahoma City, Oklahoma using a false identification with the name "Miguel Lopez-Lopez." He said he saw the car in a shop when a window was being replaced and decided to buy it. On cross-examination, he acknowledged that he had told law enforcement after his arrest that he had been given the Grand Cherokee in Las Vegas and he was delivering it to a restaurant at 44th and Main in Oklahoma City.

The court did not find the defendant's testimony at the suppression hearing credible on the ownership of the vehicle. The court found no support for defendant's testimony that he had actually purchased the car. That testimony was contrary to what he told Trooper Walker at the scene and what he told law enforcement

after his arrest.  He produced no other evidence to support his testimony that he purchased the car using a false identification. In sum, the court did not find this testimony believable.

Having found no evidence to support the defendant's contention that he owned the Grand Cherokee, the court finds that the defendant lacks standing to challenge the search of the vehicle. As noted previously, mere possession of the vehicle is not enough to establish standing.  A driver of the car who lacks standing to challenge the search directly has standing to challenge the initial stop, his own seizure, and any evidence derived from that seizure. Brendlin v. California, 551 U.S. 249, 257-58 (2007) (discussing a passenger).  A defendant "must first establish that the detention did violate his Fourth Amendment rights."  United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir.), cert. denied, 531 U.S. 887 (2000).  Then, he must show a factual nexus, or "but for" causation, showing that "the evidence sought to be suppressed is a product of his or her unlawful detention."  United States v. DeLuca, 269 F.3d 1128, 1134-35 (10th Cir. 2001) (emphasis added). "At a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." Nava-Ramirez, 210 F.3d at 1131.  In showing a factual nexus, defendant must put on evidence to demonstrate that, had he "requested permission or otherwise attempted to depart the scene,

he would have been able to leave in [the owner's] car." <u>Id</u>.

The court has determined that the detention in this case was lawful. Even assuming the detention violated defendant's Fourth Amendment rights, Trooper Walker testified that, had defendant requested permission to leave, he would not have allowed him to leave with the car. Thus, defendant has not shown the evidence discovered in the oil pan was derived from a violation of his own Fourth Amendment rights.

Even assuming that the defendant had standing to challenge the search of the Grand Cherokee, the court finds that the defendant has not demonstrated that his Fourth Amendment rights were violated. Again, the court has determined that the detention in this case was lawful. Therefore, the defendant's contention that the consent to search was the fruit of the illegal detention lacks merit.

**Consent to Search**

A law enforcement officer may conduct a warrantless search of a vehicle "if a person in control of the vehicle has given his voluntary consent to the search." <u>United States v. Zubia-Melendez</u>, 263 F.3d 1155, 1162 (10th Cir. 2001). Whether a defendant's consent to search his vehicle was voluntary is a question of fact, and the court considers the totality of the circumstances in making this determination. <u>United States v. Dozal</u>, 173 F.3d 787, 795 (10th Cir. 1999). The government bears the burden of proof on this issue, and

"must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993).

The circumstances show that the consent of the defendant was voluntary. The court recognizes there were some communication problems between Trooper Walker and the defendant. The defendant, however, appeared to understand most of the questions and made responsive answers. The defendant reacted positively to Trooper Walker's request to search. The court notes further that the defendant had the assistance of the passenger on this question, who spoke better English than he did. There was no indication that he failed to understand what was being asked. Trooper Walker indicated that both occupants of the car nodded and said yes when he sought consent. The court credits this uncontradicted testimony. In addition, the defendant never raised any objection to the search as it was being carried out by the troopers. In sum, the court finds that the consent was voluntarily given.

The defendant has also suggested that the search exceeded the scope of the consent. The defendant argues that he was forced to stand by the side of the road for nearly an hour while the search was being conducted.

Whether the search exceeded the duration of the defendant's consent is a question of fact. United States v. Rosborough, 366

19

F.3d 1145, 1150 (10th Cir. 2004).   There is no absolute rule specifying the permissible duration of a search performed with the defendant's consent.   Rather, the court asks "what a reasonable person would have understood to be the scope and duration of his consent under the circumstances."   Id.

The court does not find that the search exceeded the scope of the consent.   The court finds that the trooper acted with diligence in conducting the search even though the search lasted for almost an hour.   The general consent given by the defendant did not limit the time or location of the search.   See Rosborough, 366 F.3d at 1151 (search that lasted just under an hour did not exceed duration of defendant's consent because the general consent "was confined by neither time nor location" and the officers acted with diligence in conducting the search).

**Movement of the Vehicle**

Finally, the defendant has contended that he was illegally detained when he was ordered to drive his car to the garage to permit disassembly of it.   The defendant argues that the arrest was made without probable cause and any later discovery was the fruit of the illegal detention.

As noted previously, the court has found that defendant's detention was converted to a consensual encounter at the moment Trooper Walker returned his documents and said, "Adios." Thereafter, Trooper Walker received voluntary consent to search the

20

Grand Cherokee.  During that search, Trooper Walker found evidence that created probable cause that the defendant was engaged in criminal activity, likely involving drug trafficking.  See Ledesma, 447 F.3d at 1317 (". . . visual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search.").

The stop at issue evolved from a mere traffic stop to one based on probable cause of criminal activity before the defendant was asked to move the truck.  The totality of the circumstances show that Trooper Walker had a particularized and objective basis for suspecting legal wrongdoing.  Initially, Trooper Walker had reasonable suspicion that the defendant was engaged in criminal activity.  This reasonable suspicion was based upon the following: (1) the decision of the defendant to leave I-70 immediately after seeing the marked patrol car; (2) the defendant's decision to take a route on an obscure county road that was not the most direct; (3) the defendant's decision to stop at a gas station when he had recently filled up the Grand Cherokee as evidenced by the gas gauge that showed a full tank; (4) the defendant was not the owner of the vehicle and all he could offer about the ownership of the Grand Cherokee was that it belonged to an "amigo;" (5) the presence of air fresheners in the vehicle; (6) the presence of only one duffel bag for two people who were purportedly on approximately a ten-day trip; and (7) the extreme nervousness of the defendant.  The search

that followed the defendant's consent provided additional evidence of criminal activity.  This search led Trooper Walker to believe that there was a hidden compartment within the oil pan of the vehicle.  Trooper Walker reached this conclusion based upon: (1) the excessive tooling around the hardware where the oil pan was attached; (2) the welds around the oil pan were unusual; (3) the oil pan was cleaner than the remainder of the underside of the vehicle; (4) the gasket around the oil pan appeared new and did not fit properly; and (5) the oil pan produced an atypical sound when it was tapped.  In sum, the court finds that Trooper Walker had probable cause to believe at that time that the vehicle had a hidden compartment where he believed narcotics would be found.  The removal of the vehicle from the county road to a garage for a further search was not a violation of the Fourth Amendment. Moreover, the uncontradicted evidence before the court indicated that the defendant agreed to move the Grand Cherokee to another location for the search to continue.  In sum, the court finds no merit to the defendant's contention that the movement of the Grand Cherokee to the co-op for continued searching violated his Fourth Amendment rights.

The court finds no support for the defendant's motion to suppress evidence.  The motion shall be denied.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress evidence (Doc. # 12) be hereby denied.

22

**IT IS SO ORDERED.**

Dated this 7th day of May, 2012 at Topeka, Kansas.

                              s/Richard D. Rogers
                              United States District Judge